## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO. 24-20008-CIV-LENARD/ELFENBEIN

**JOSE PETERSEN,**

      Plaintiff,

**v.**

**INK 477, LLC**, a Florida limited liability
Company d/b/a "Level 6," "Level 6 by Amal,"
"Amal," and "Amal Miami,"
and,
**GROVE INK, LLC**, a Florida limited liability
company d/b/a "Level 6," "Level 6 by Amal,"
"Amal," and "Amal Miami,"

      Defendants.

_____/

## OMNIBUS ORDER

    **THIS CAUSE** is before the Court on cross motions for summary judgment:

Plaintiff Jose Petersen's Motion for Summary Judgment ("Plaintiff's Motion," D.E. 89),

Response in opposition (D.E. 99), and Reply in support (D.E. 105), and Defendants Ink

477, LLC and Grove Ink, LLC's Motion for Summary Judgment ("Defendants' Motion,"

D.E. 92), Response in opposition (D.E. 101), and Reply in support (D.E. 103).  Upon

review of the Motions, Responses, Replies, and the record, the Court finds as follows.

## I.    Background[1]

---

[1] The following facts are gleaned from Plaintiff's Statement of Material Facts (D.E. 88) and
Material Facts in Dispute (D.E. 100) as well as Defendants' Statement of Material Facts (D.E. 91)
and Material Facts in Dispute (D.E. 98).  All facts are undisputed unless otherwise noted.

Ink 477, LLC and Grove Ink, LLC (jointly, "Defendants") are Florida limited liability companies which jointly own the restaurants Amal Miami ("Amal") and Level 6 in Miami, Florida.  (D.E. 91 ¶ 1).  Both restaurants are located in Coconut Grove at 3480 Main Highway, Miami, FL 33131.  (D.E. 88 ¶ 4; D.E. 91 ¶ 2).  Amal is located on the first floor of the building and Level 6 occupies the sixth floor.  (*Id.*).

Jose Petersen ("Plaintiff") worked as a server at Amal from June 12, 2022, to September 4, 2022, and as a server at Level 6 from May 7, 2023, through September 8, 2023.  (D.E. 88 ¶ 1; D.E. 91 ¶¶ 3, 19).  Plaintiff's employment at Amal "ended in 2022 because he resigned on good terms and was offered the ability to return."  (D.E. 91 ¶ 28).[2] "Plaintiff's employment from Level 6 ended on September 8, 2023 because he was terminated."  (D.E. 91 ¶ 29).  The Parties dispute the reasons for Plaintiff's termination. Plaintiff asserts he was terminated for asserting his rights under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et. seq.*, by making complaints that Level 6 was "improperly retaining portions of this tips."  (D.E. 88 ¶ 60; D.E. 89 at 17–19).  Defendants contend that "Plaintiff was terminated from Level 6 because management received complaints from multiple guests that Plaintiff asked them to leave him an extra gratuity

---

[2] Plaintiff contends this fact is "Disputed and immaterial.  The statement is immaterial because the adverse employment actions at issue occurred in 2023, not 2022."  (D.E. 100 ¶ 28).  However, the Parties do not dispute that the adverse employment actions occurred in 2023 at Level 6 and not in 2022 at Amal.  Plaintiff thus fails to specify the basis of the dispute.  To the contrary, Plaintiff confirms in his deposition that his position at Amal was a "summer job" and the restaurant knew at the time he was hired that he would be leaving at the end of the summer.  (D.E. 87-1 at 91:15–25).  Therefore, the Court finds the fact undisputed.

because Level 6 keeps the entire service charge" and because he "failed to attend a mandatory employee meeting on September 7, 2023." (D.E. 98 ¶ 61).

Various payment schemes were in place while Plaintiff was employed at the two restaurants. The Court must separately address his employment at Amal and Level 6. Moreover, as to Amal, the Court must separate his employment into two periods: June 12, 2022 through June 25, 2022 (the "First Employment Period") and June 26, 2022 through September 4, 2022 (the "Second Employment Period").

### a.    Amal

Servers at Amal were paid through a combination of "hourly wages, tips, and service charges." (D.E. 91 ¶ 6).

- "Hourly wages" were based on the minimum wage at the time, less the maximum amount of a conditional tip credit for tipped employees.[3] (D.E. 88 ¶ 12). For example, in the summer of 2022 the minimum hourly wage rate in Florida was $10.00 per hour, so the reduced hourly rate paid was $6.98, representing the then applicable minimum wage rate of $10.00, less the maximum allowable tip credit of $3.02. (*Id.* ¶ 13).

- "Tips" represented additional amounts (above any automatic service charges applied by the restaurant) which a customer voluntarily provided to Plaintiff. (D.E. 88 ¶ 16). Servers were required to participate in a "tip pool" which required them

---

[3] The FLSA defines a "tipped employee" as "any employee engaged in an occupation in which he customarily and regularly receives more than $30 a month in tips." 29 U.S.C. § 203(t).

to share a percentage of their tips with support staff such as bussers, runners, and hostesses.  (*Id.* ¶ 22; citing D.E. 87-12, Amal's "Tip Pool Notice").

- "Service charges" equal to 20% of the total bill were automatically imposed upon customers during the First Employment Period at Amal.  (D.E. 88 ¶ 34; D.E. 91 ¶¶ 4, 17).  The service charge proceeds were pooled and split between servers, support staff, and the restaurant in various percentages.  (*Id.*).

### 1.    First Employment Period: June 12, 2022–June 25, 2022

**Hourly Wages:** For the bi-weekly pay period ending on June 25, 2022, Plaintiff trained for 14 hours at the minimum wage rate of $10 per hour and worked an additional 70.8 hours at the regular serving rate.  (D.E. 91 ¶¶ 10–11).  Plaintiff did not work any overtime hours during the two-week First Employment Period.  (D.E. 100 ¶ 4).

**Tips:** A "tip pool" was in place during this time wherein servers kept 75% of their tips and were required to "contribute 25% of their tips to the support staff (bussers, runners, and hostess)."  (D.E. 88 ¶ 22; citing D.E. 87-12, Amal's "Tip Pool Notice").  The Parties dispute the validity of the tip pool.

**Service Charges:** During this period, Amal imposed a 20% service charge on all bills.  (D.E. 91 ¶ 4).

### 2.    Second Employment Period: June 26, 2022–September 4, 2022

**Hourly Wages:** Beginning June 26, 2022, Amal eliminated service charges except for certain special events.  (D.E. 91 ¶ 7).[4]  With this change, Defendants classified Plaintiff

---

[4] Plaintiff contends this fact is "Disputed in Part."  Plaintiff, however, proceeds to explain that services charges were "discontinued … on or about June 26, 2022" but "Defendants continued to

4

as a "tipped employee." (D.E. 90-5).[5]  Plaintiff was paid for overtime hours worked, but

Defendants concede that they underpaid his overtime wages by $51.98. (D.E. 92 at 6; D.E.

88 ¶ 57; D.E. 98 ¶ 57).  Nevertheless, Defendants claim this amount is *de minimis* and was

repaid to Plaintiff through a $534.40 overpayment when he worked at Level 6 the following

year.  (*Id.*).

**Tips:** A "tip pool" remained in effect during this period and the Parties dispute its

validity.

**Service Charges:** As discussed, service charges were removed except for certain

special events.

### b.    Level 6 (May 7, 2023–September 8, 2023)

Servers at Level 6 were also paid through a combination of "hourly wages, tips, and

service charges." (D.E. 91 ¶ 6).

**Hourly Wages:** Plaintiff was paid $7.98 per hour[6] with a time-and-a-half overtime

rate of $13.48 per hour.  (D.E. 91 ¶¶ 22–23).  Although Plaintiff was paid $534.49 in

overtime, Defendants claim that—although they did not seek renumeration—Plaintiff

---

collect service charges from customers during special events." (D.E. 100 ¶ 7).  Plaintiff is saying
the same thing in different words.  The Court thus finds the fact undisputed.

[5] Defendants assert that this change was communicated to employees at a June 27, 2022, staff
meeting.  (D.E. 91 ¶ 9).  Although Plaintiff objects to Defendants' HR Manager's testimony
concerning the staff meeting as inadmissible hearsay (D.E. 100 ¶ 9), he does not dispute that he
signed the Tipped Employee Notice (D.E. 90-5) explaining the change on June 27, 2022.  (*See
also* D.E. 90-2 at 97:12–25, 98:1–13).

[6] The Parties agree that Florida's minimum wage was $11.00 per hour in 2023, and so the reduced
hourly rate paid was $7.98 ($11.00 minus the maximum allowable tip credit of $3.02).  (*See* D.E.
91 ¶ 21; D.E. 100 ¶ 21).

should not have been paid any overtime because Level 6 was exempt from the FLSA's overtime wage provisions[7] under the 29 U.S.C. § 207(i) exemption ("7(i) exemption").[8] (D.E. 92 at 6).  In other words, Defendants claim that the overtime wages were paid in error because Plaintiff was actually subject to the 7(i) exemption.  (*See id.*).

**Tips:** A "tip pool" was in effect wherein Defendants pooled "100% of the optional tips received."  (D.E. 87-13; D.E. 90-8).  Servers were required to "contribute 25% of their tips to the support staff (bussers, runners, hostess)."  (*Id.*).  As for the remaining 75%, the Parties dispute how the funds were redistributed.  According to Defendant, "the server

---

[7] Regarding overtime wages, the FLSA states that:

> Except as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

29 U.S.C. § 207(a)(1).

[8] The FLSA's 7(i) exemption states that:

> No employer shall be deemed to have violated subsection (a) by employing any employee of a retail or service establishment for a workweek in excess of the applicable workweek specified therein, if (1) the regular rate of pay of such employee is in excess of one and one-half times the minimum hourly rate applicable to him under section 206 of this title, and (2) more than half his compensation for a representative period (not less than one month) represents commissions on goods or services. In determining the proportion of compensation representing commissions, all earnings resulting from the application of a bona fide commission rate shall be deemed commissions on goods or services without regard to whether the computed commissions exceed the draw or guarantee.

29 U.S.C. § 207(i).

retain[ed] 75% of the tip[.]"  (D.E. 91 ¶ 20(a)).[9]  Plaintiff contends that "'100% of the optional tips' were contributed to an <u>invalid</u> tip pool, with servers AS A GROUP sharing a redistribution of 75% of the total tips, and the remaining 25% being redistributed to others 'that have not customarily and regularly participated in tip pooling arrangements...'".  (D.E. 100 ¶ 20(a), citing D.E. 87-13).[10]  The Parties dispute the validity of the tip pool.

**Service Charges:**  A 20% service charge was imposed on all bills.  (D.E. 91 ¶ 22(a)).[11]  The service charge was disclosed on Level 6's menu.  (D.E. 91 ¶ 22(a)).[12]  Level 6's menu stated that "PRICES ARE NOT INCLUSIVE OF 20% SERVICE CHARGE." (D.E. 90-16 at 1).  Plaintiff and Defendants also filed Level 6's Service Charge Distribution Notice to Employee as record evidence.  (D.E. 87-15; D.E. 90-9).  The Notice provides that Level 6 "will charge 20% on all checks and 22% for events."  (*Id.*).  Level 6 kept a percentage of the service charge proceeds to cover restaurant expenses, and employees— including servers, bartenders, runners, bussers, and barbacks—were distributed a portion

---

[9] Defendants botched the numbering in their Statement of Material Facts.  The mistake begins at page five when ¶ 23 is followed by ¶ 19.  (D.E. 91 at 5).  As such, there are two paragraphs ¶¶ 19, 20, 21, 22, and 23.  The Court refers to the duplicate numbers on pages five and six as ¶¶ 19(a), 20(a), 21(a), 22(a), and 23(a).

[10] The Court likewise refers to Plaintiff's response to the duplicate paragraphs as ¶¶ 19(a), 20(a), 21(a), 22(a), and 23(a).  (D.E. 100 at 7).

[11] Plaintiff clarifies that "[t]he 'service charge' was imposed upon customers in the amount of 20% over their food and beverage orders, or 22% for events."  (D.E. 100 ¶ 22(a)).

[12] Plaintiff does not dispute this fact; however, he asserts that "[t]he content of menus is inadmissible hearsay which cannot be used to support summary judgment in accordance with Rule 56(c)."  (D.E. 100 ¶ 22(a)).  But here, Defendants filed the actual Level 6 menu (D.E. 90-16) as record evidence and Plaintiff makes no objection to its authenticity.  Defendants do not merely rely on deposition testimony regarding the menu's content as Plaintiff suggests.

of the service charge commissions based on a point system methodology. (*Id.*). The Parties dispute the validity of the service charge distributions.

On January 2, 2024, Plaintiff filed his Complaint against Defendants (D.E. 1), alleging the following counts:

- <u>Count I</u>: FLSA Violation (Retaliation by Employer), (*id.* ¶¶ 21–25);

- <u>Count II</u>: FLSA Violation (Failure to Pay Overtime Wages, (*id.* ¶¶ 26–30);

- <u>Count III</u>: Breach of the Agreement to Pay Negotiated Share of the so-called "Service Charge" (Common Law Suit for Unpaid Wages); (*id.* ¶¶ 31–36);

- <u>Count IV</u>: FLSA Violation (Tip Confiscation), (*id.* ¶¶ 37–45);

- <u>Count V</u>: FLSA Violation (Minimum Wage Requirements), (*id.* ¶¶ 46–55).

On February 19, 2024, Defendants filed their Answer (D.E. 15) which alleges Affirmative Defenses including, *inter alia*, that Plaintiff seeks recovery for *de minimis* work time and service charges are not tips subject to the FLSA. (*Id.* at 7–8).

## II.    Legal Standards

On a motion for summary judgment, the Court must construe the evidence and factual inferences arising therefrom in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Summary judgment can be entered on a claim only if it is shown "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Supreme Court has explained the summary judgment standard as follows:

> [T]he plain language of [Rule 56] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential

> to that party's case, and on which that party will bear the burden of proof at
> trial.  In such a situation, there can be no genuine issue as to any material
> fact, since a complete failure of proof concerning an essential element of the
> non-moving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (internal quotation omitted).  The

trial court's function at this juncture is not "to weigh the evidence and determine the truth

of the matter but to determine whether there is a genuine issue for trial."  *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).  A dispute about a material fact is

genuine if the evidence is such that a reasonable fact-finder could return a verdict for the

nonmoving party.  *Id.* at 248.

The party moving for summary judgment "always bears the initial responsibility of

informing the district court of the basis for its motion, and identifying those portions of the

'pleadings, depositions, answers to interrogatories, and admissions on file, together with

affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material

fact."  *Celotex*, 477 U.S. at 323.  Once the movant makes this initial demonstration, the

burden of production, not persuasion, shifts to the nonmoving party.  The nonmoving party

must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers

to interrogatories, and admissions on file,' designate 'specific facts showing that there is a

genuine issue for trial.'"  *Id.* at 324; *see also* Fed. R. Civ. P. 56(c).  In meeting this burden

the nonmoving party "must do more than simply show that there is a metaphysical doubt

as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

586 (1986).  That party must demonstrate that there is a "genuine issue for trial."  *Id.* at

587.  An action is void of a material issue for trial "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party."  *Id.*

Where, as here, there are competing cross-motions for summary judgment, the Court considers each motion separately, and "the facts are viewed in the light most favorable to the non-moving party on each motion[.]"  *Chavez v. Mercantil Commercebank, N.A.*, 701 F.3d 896, 899 (11th Cir. 2012).  "Cross-motions for summary judgment will not, in themselves, warrant ... granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed."  *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984).

## III.  Discussion

In their cross-motions for summary judgment, the Parties argue their respective positions concerning all five counts in the Complaint.  The Court shall discuss each in turn.

### Count I: FLSA Retaliation

This count alleges that during his tenure at Level 6 in 2023, Plaintiff asserted his rights under the FLSA and Defendants retaliated against him by cutting his work hours and eventually terminating his employment.  (D.E. 1 ¶¶ 21–25).

#### a.    Plaintiff's Motion

Plaintiff argues that he exercised FLSA protected rights by making verbal and written complaints to Level 6's management and human resources ("HR") officials concerning the unlawful withholding of his FLSA earnings.  (D.E. 89 at 17).  Plaintiff asserts that his verbal and written complaints began shortly after he commenced work at

10

Level 6 and continued until—and after—his termination.  (D.E. 88 ¶¶ 60–64).[13]  Plaintiff claims that "immediately after he first complained, his schedule was reduced" prior to his termination in September 2023.  (D.E. 89 at 17).  Plaintiff further asserts that Defendants "have produced no disciplinary or other record to rebut the presumption of discrimination which arises under these undisputed facts." (*Id.* at 18).   In their Response, Defendants rebuff Plaintiff's assertions of reduced hours and contend that "Plaintiff is unable to show a causal connection between his protected activity and the adverse action" because he was terminated based on customer complaints and failure to attend a mandatory staff meeting. (D.E. 99 at 7–9).

Under the FLSA, it is unlawful for an employer to "discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding[.]"  29 U.S.C. § 215(a)(3).  In the Eleventh Circuit, FLSA retaliation claims are analyzed under the burden-shifting framework employed by courts in cases brought under Title VII of the Civil Rights Act. *See e.g.*, *Wolf v. Coca-Cola Co.*, 200 F.3d 1337, 1342–43 (11th Cir. 2000).  To establish a prima facie case of FLSA retaliation, Plaintiff must demonstrate that (1) he "engaged in activity protected" under the FLSA; (2) he "subsequently suffered adverse action by the

---

[13] Plaintiff filed three emails as record evidence and Defendants do not dispute their authenticity. (D.E. 87-2 at 10–11).  The first email is dated June 1, 2023.  (*Id.* at 10).  Therein, Plaintiff reports a discrepancy in his "extra tips."  (*Id.*). He states that he should be permitted to keep 85% of the extra tips, but his check shows that he only retained 75%.  (*Id.*)  The second email is dated June 6, 2023, and Plaintiff makes the same report to Level 6's management.  (*Id.* at 11).  The final email is dated September 22, 2023.  (*Id.* at 12).  Therein, HR informs Plaintiff that his employment was terminated.  (*Id.*).  HR also responds regarding Plaintiff's claims of discrepancies in his tip distributions.  (*Id.*).

11

employer"; and (3) "a causal connection existed between the employee's activity and the adverse action." *Id.* (citation omitted).  If the employer asserts a legitimate reason for the adverse action, the plaintiff may attempt to show pretext. *Id.*  In demonstrating causation, the plaintiff must prove that the adverse action would not have been taken "but for" the assertion of FLSA rights. *Id.* (citing *Reich v. Davis*, 50 F.3d 962, 965–66 (11th Cir. 1995)).

Defendants make no argument regarding the first element.  (*See* D.E. 92 at 1–3; D.E. 99 at 7–9; D.E. 103 at 2–3).  Defendants thus concede that Plaintiff engaged in FLSA protected activity.[14]

As to the second element, it is undisputed that the termination of Plaintiff's employment qualifies as an adverse employment action.  However, Defendants argue that Plaintiff's asserted reduction in hours does not meet the test.  (*See* D.E. 99 at 7–8).  Plaintiff argues in his Response to Defendants' Motion that his hours dropped from around 100 during his first two pay periods, to 56 after his initial June 1, 2023, email complaint, after which he was never assigned more than 69 hours per pay period in the lead up to his termination.  (*See* D.E. 101 at 8).  Plaintiff files his timesheets from Level 6 (D.E. 87-11 at 1–16) as record evidence in support of his contention.  However, unfortunately for Plaintiff, his claim is undermined by the very evidence he cites in support.  Plaintiff's timesheets

---

[14] In any event, the Court finds that Plaintiff's written and oral complaints concerning his tips qualify as protected activity.  *See Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 14 (2011) ("To fall within the scope of the antiretaliation provision, a complaint must be sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the statute and a call for their protection.  This standard can be met, however, by oral complaints, as well as by written ones.").  The complaints are protected even though—as explained below in Count IV—Defendants' conduct was legal. *See Keith v. Univ. of Miami*, 437 F. Supp. 3d 1167, 1172 (S.D. Fla. 2020) (explaining that complaints of legal activity may be protected under the FLSA).

reveal that he worked a total of 115.97 hours in May 2023, 124.26 hours in June 2023, 144.28 hours in July 2023, and 103.65 hours in August 2023. (*See* D.E. 87-11 at 1–16). Plaintiff's evidence reveals that he worked *more* hours in June and July following his June 1 email complaint. If Plaintiff were truly being retaliated against, it defies logic that he would work *more* hours after his initial complaint.

Additionally, Plaintiff's slight dip in hours during the month of August—103.65 hours compared to the 115.97 worked in May—is too insignificant to be considered an adverse employment action. Rather, it is undisputed that Plaintiff's hours varied based on the volume of customers, and he was not scheduled to work a set number of hours per shift. Plaintiff confirms this in his deposition testimony, and his time records reveal that his hours varied greatly during his entire employment period at Level 6. (*See id.*).

That said, Plaintiff consistently worked every Thursday, Friday, Saturday, and Sunday. (*See id.*). Plaintiff's schedule did not change after his FLSA-related complaints began. As Defendant explains, Plaintiff worked weekend days—prime shifts for a restaurant server—and he was consistently scheduled for double shifts on Saturdays or Sundays. (D.E. 103 at 2; *see also* D.E. 87-11 at 1–16). Plaintiff does not dispute this; he makes no claim that Defendants took away his weekend shifts, nor could he based on the time records he filed as record evidence. In sum, based on the undisputed facts, Plaintiff fails to establish an "adverse employment action" by way of reduced hours.[15] *Wolf*, 200 F.3d at 1342–43.

---

[15] Thus, hereinafter, "adverse employment action" refers only to Plaintiff's termination and not his alleged reduction in work hours.

As to the third element, Plaintiff must establish causation; that his employment would not have been terminated "but for" the assertion of his FLSA rights. *Wolf*, 200 F.3d at 1342–43. Plaintiff states that his FLSA-related complaints began "shortly upon his return to work in [May] 2023" and persisted through continued verbal and written complaints. (D.E. 88 ¶¶ 60–64). Nevertheless, the undisputed facts establish that Plaintiff was not terminated until he failed to attend a mandatory staff meeting on September 7, 2023. As record evidence, Defendants filed a text message between Plaintiff and a Level 6 manager in which Plaintiff reported that he would not be attending the mandatory staff meeting. (D.E. 90-12). Therein, Plaintiff reports that he is "staying home," to which the manager responds that the meeting is "mandatory" and "required of all employees" such that Plaintiff "would need to find a way to make it."[16] (*Id.*). It is further undisputed that Plaintiff's employment was terminated on September 8, 2023—the day after he failed to attend the mandatory meeting. (D.E. 91 ¶ 29; D.E. 100 ¶ 29). Put simply, the undisputed facts show that Plaintiff failed to attend a mandatory meeting on September 7, 2023, and his employment was terminated on September 8, 2023. What does not follow is that the September 8, 2023 termination was actually predicated on FLSA-related complaints beginning in May 2023. The Court thus finds that Plaintiff fails to establish "a causal connection" between his protected complaints and the adverse action. *Wolf*, 200 F.3d at 1342–43.

---

[16] Although Plaintiff contends there is "no record of any such meeting taking place, or of Petersen's supposed absence, or of any other person's attendance," he disputes neither the authenticity nor the contents of the text message. (D.E. 100 ¶ 31).

In sum, Plaintiff fails to meet his initial burden of establishing a prima facie case, and he comes nowhere near his burden on summary judgment. *See* Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."). Therefore, Plaintiff's Motion is due to be denied, and he is not entitled to summary judgment on Count I.

### b.   Defendants' Motion

Defendants' Motion centers of the element of causation and their asserted legitimate reasons[17] for Plaintiff's termination. (*See* D.E. 92 at 1–3). For the same reasons Plaintiff's Motion is due to be denied, Defendants' Motion is due to be granted. As discussed, the undisputed facts establish that Plaintiff was terminated on September 8, 2023, after missing a mandatory staff meeting on September 7, 2023. Viewing the evidence in the light most favorable to Plaintiff, a reasonable factfinder would be unable to conclude that the termination in September was caused by the FLSA-related complaints that began in May.[18] Plaintiff thus fails to make a sufficient showing on an essential element of his case. As such, "there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders

---

[17] To be clear, Defendants produced additional reasons—namely, customer complaints concerning Plaintiff—but Plaintiff's absence at the September 7, 2023 mandatory staff meeting is a sufficient reason standing alone.

[18] Notably, Plaintiff has produced no evidence of written complaints in July, August, or in the days leading up to his termination on September 8, 2023. As discussed, the emails Plaintiff filed as record evidence are dated June 1, 2023; June 6, 2023; and September 22, 2023. (D.E. 87-2 at 10–12).

all other facts immaterial." *Celotex*, 477 U.S. at 322–23.  In sum, there is no genuine dispute of material fact as to causation and Defendants are entitled to judgment as a matter of law.  Fed. R. Civ. P. 58(a).

      Alternatively, Plaintiff's absence at the mandatory staff meeting is a legitimate reason for his termination, and Plaintiff fails to show pretext. *See Johnson v. Advertiser Co.*, 778 F. Supp. 2d 1270, 1281 (M.D. Ala. 2011) ("To show pretext and thereby avoid summary judgment, the plaintiff must produce sufficient evidence for a reasonable fact finder to conclude that a retaliatory reason for the adverse employment action is more likely or that each of the employer's proffered reasons for the adverse employment action is unworthy of credence.").  As discussed, Plaintiff's only rebuttal regarding the staff meeting is that "there is no record of any such meeting taking place, or of Petersen's supposed absence, or of any other person's attendance[.]"  (D.E. 100 ¶ 31).  However, Plaintiff disputes neither the authenticity nor the contents of the text message concerning the meeting, and he produces no evidence of pretext.  In other words, Plaintiff fails to show that a retaliatory reason for his termination is more likely or that the reason provided is unworthy of credence.  Therefore, Defendants' Motion is due to be granted, and they are entitled to summary judgment on Count I.

### Count II: FLSA (Failure to Pay Overtime Wages)[19]

This count alleges that Defendants failed to pay Plaintiff *any* overtime wages at Level 6, and that they failed to pay him the correct amount of overtime wages during the Second Employment Period at Amal.  (*See* D.E. 1 ¶¶ 26–30).  The Parties agree that Plaintiff did not work any overtime hours during the two-week First Employment Period at Amal and so the Court need not decide whether the 7(i) exemption applied.  As such, all references to the 7(i) exemption below apply solely to Level 6.

**a.     Plaintiff's Motion**

**1.     7(i) Exemption (Level 6)**

As explained, Defendants claim that Plaintiff was exempt from the FLSA overtime wage provisions under the 7(i) exemption for the duration of his employment at Level 6. Plaintiff argues that Defendants waived their ability to claim the 7(i) exemption by failing to plead it as an affirmative defense in their Answer; and, in any event, "the [7(i)] exemption has never applied to restaurant wait-staff."  (D.E. 89 at 7).  As to Count II, Plaintiff and Defendants' Motions turn on the applicability of the 7(i) exemption.  The Court addresses the arguments in turn.

**i.     Waiver of 7(i) Exemption**

Plaintiff cites no authority for his claim that the 7(i) exemption must be pleaded as an affirmative defense in an answer.  (*See* D.E. 89 at 6; D.E. 100 ¶ 4).  The Court has found

---

[19] Count I of the Complaint alleges a FLSA violation for "retaliation by employer" and Count II alleges a FLSA violation for "failure to pay overtime wages."  (D.E. 1 at 4–5).  Plaintiff's Motion mistakenly refers to "FLSA Overtime Wage Claims: Count I."  (D.E. 89 at 5).  Herein, the Court will refer to the counts as numbered in the Complaint.

no supporting authority for Plaintiff's claim. To the contrary, a fellow district court in this Circuit has found "that § 207(i) is not an affirmative defense that [a party waives] by not specifically pleading it[.]" *Kuntsmann v. Aaron Rents, Inc.*, 903 F. Supp. 2d 1258, 1267 (N.D. Ala. 2012).[20] This Court is persuaded by the reasoning in *Kuntsmann* and reaches the same conclusion.

Even assuming such a rule existed, Defendants' Answer alleges as an affirmative defense that "'service charges,' do not constitute tips, and therefore, are not subject to the Fair Labor Standards Act." (D.E. 15 at 7). The Court finds that this provides sufficient notice of Defendants' 7(i) exemption affirmative defense. Although § 207(i) is unnamed, the basis of the defense is spelled out. The Court thus proceeds to the merits.

### ii.     Application of 7(i) Exemption to Restaurant Waitstaff

Plaintiff states emphatically that the 7(i) exemption has never applied to restaurant waitstaff. Although Defendants cite authority to the contrary, Plaintiff digs in his heels in his Reply asserting that "no trial court, appellate court, federal or state, published or unpublished, has ever concluded that restaurant wait-staff are exempt for purposes of the [7(i)] exemption." (D.E. 105 at 3). Unfortunately, Plaintiff's bold assertion is wrong.

In *Compere v. Nusret Miami, LLC*, the Eleventh Circuit held in a case of first impression that restaurant waitstaff were exempt under 7(i). 28 F.4th 1180, 1186 (11th Cir. 2022); *see also Rosell v. VMSB, LLC*, No. 23-12658, 2024 WL 1617821, at *1 (11th Cir. Apr. 15, 2024) (applying *Compere* and holding that an automatic charge applied to all

---

[20] The district court noted that "very little case law addresses this issue, and none in this Circuit" and made its determination based on out-of-circuit precedent. *Id.*

customer bills counts as a service charge, not a tip, and can lawfully be used to offset an employer restaurant's FLSA wage obligations).  In sum, Plaintiff's Motion is based on an incorrect legal premise.  Therefore, Plaintiff's Motion is due to be denied as to his overtime wage claims involving Level 6, and he is not entitled to summary judgment on Count II.

### 2.    Overtime Wage Calculations (Amal: Second Employment Period)

As explained, Defendants did not claim the 7(i) exemption during the Second Employment Period at Amal.  Plaintiff was thus paid at an overtime rate for extra hours worked.  However, Defendants explain that some miscalculations were made.

First, for the week of July 24, 2022 to July 30, 2022, Plaintiff was underpaid by $8.38 for the .7 hours of overtime he worked.[21]  Second, for the week of July 31, 2022 to August 6, 2022, Plaintiff was underpaid by $52.47.[22]  Third, for the week of August 21, 2022 to August 27, 2022, Plaintiff was underpaid by $134.77.[23]  Fourth, for the week of

---

[21] Instead of being paid at an overtime rate of $10.47 (*see* D.E. 87-5 at 4), Plaintiff should have been paid at an overtime rate of $11.98.  (*See* D.E. 92 at 6 ($10 minimum wage times 1.5 equals $15.  $15 minus the maximum allowable tip credit of $3.02 equals $11.98.  $11.98 times .7 overtime hours equals $8.38.)).

[22] 42.10 hours worked times the $6.98 hourly rate equals $293.85 plus $407.73 service charge for a special event equals $701.58 divided by the total hours equates to a regular rate of $16.66 and an overtime rate of $24.99 an hour.  As such, 2.10 overtime hours times $24.99 equals $54.47. (*See* D.E. 92 at 6).

[23] Like the first week, instead of being paid at an overtime rate of $10.47 (*see* D.E. 87-5 at 6), Plaintiff should have been paid at an overtime rate of $11.98.  (*See* D.E. 92 at 6 (11.25 overtime hours times $11.98 equals $134.77)).

August 28, 2022 to September 3, 2022, Plaintiff was underpaid by $27.55.[24]  Defendants

thus explain that:

> For weeks 1 and 2, the total that should have been paid was a *combined* $60.85 and results in a *total* underpayment of **$31.53**. For weeks 3 and 4, the total that should have been paid was a *combined* $162.32 and results in a *total* underpayment of **$20.45**. This amount is de minimis and already paid by the overpayments received by the Plaintiff from Level 6.
>
> Here, the Plaintiff was overpaid $534.49, in total at Level 6, for overtime during the pay periods of 05/14/2023-05/27/2023, and 05/28/2023-06/10/2023 … [because] Plaintiff should never have been paid any overtime rate while Level 6 was using the 7(i) system.

(D.E. 92 at 6).

In response, Plaintiff claims he "was underpaid **$1,941.12** on account of overtime

hours worked, to which a like sum of liquidated damages applies, for a total of **$3,882.24**

due on account of the Count II [overtime] violations, excluding mandatory fees and costs."

(D.E. 101 at 13).  But Plaintiff provides no explanation regarding how that number was

calculated.  (*See id*; D.E. 100 ¶ 37).  The Court has also reviewed the chart (D.E. 100-1)

that Plaintiff attached to his Statement of Additional Facts and is unable to ascertain how

Plaintiff reaches the $1,941.12 figure.  Nevertheless, to the extent Plaintiff relies on

overtime hours worked at Level 6, the Court determines below that Defendants prevail on

---

[24] Again, instead of being paid at an overtime rate of $10.47 (*see* D.E. 87-5 at 6), Plaintiff should have been paid at an overtime rate of $11.98.  (*See* D.E. 92 at 6 (2.30 overtime hours times $11.98 equals $27.55)).

summary judgment as to the 7(i) exemption.  In other words, Defendants were not required to pay Plaintiff at an overtime rate for extra hours worked at Level 6.[25]

Finally, as discussed, Defendants argue that the mere $51.98 total underpayment from Amal in 2022 is *de minimis* and was already repaid to Plaintiff through his $534.49 overpayment at Level 6 in 2023.  The Court agrees with Plaintiff that the *de minimis* doctrine is inapplicable.  (*See* D.E. 101 at 12).  That doctrine is intended for instances where the time involved is small and difficult to record, not when the time worked is certain but the amount of underpayment is small.  *See Sullivan v. PJ United, Inc.*, 362 F. Supp. 3d 1139, 1165 (N.D. Ala. 2018).  Here, the time worked and amount of underpayment is small—yet certain—and so the Court finds the *de minimis* doctrine inapplicable.  The Court also agrees with Plaintiff that Defendants' late payment in 2023 does not cure the underpayment in 2022.  (*See* D.E. 101 at 13 (citing *Atl. Co. v. Broughton*, 146 F.2d 480, 482 (5th Cir. 1944)[26] (holding that liquidated damages under the FLSA arise immediately and are allowed as compensation for detention of a workman's pay))).  Therefore, Plaintiff's Motion shall be granted in part and denied in part[27] as to his overtime wage claims involving the Second Employment Period at Amal. The Court rules in favor of

---

[25] The Court thus agrees with Defendants that Level 6's $534.49 in overtime payments to Plaintiff (*see* D.E. 87-5 at 8–9) were not required under the FLSA.  Defendants state that although these payments were made in error, they were never reclaimed from Plaintiff.  (D.E. 92 at 4).

[26] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981), the Eleventh Circuit adopted as binding precedent all decisions handed down by the former Fifth Circuit before October 1, 1981.

[27] The Court finds that Plaintiff is entitled to a judgment of $103.96 rather than the $3,882.24 judgment he requested.

Plaintiff and against Defendants on his claim for overtime compensation in the amount of $51.98 plus liquidated damages in the amount of $51.98 for a total amount of $103.96. *See* 29 U.S.C. § 216(b) (holding employers responsible for damages in the amount of the unpaid overtime compensation "and in an additional equal amount as liquidated damages").[28]

> **b.     Defendants' Motion**

>> **1.     Service Charge: Mandatory Commission, not a Voluntary Tip**

The Court must first determine whether Level 6's service charge is a commission i.e., a "compulsory charge for service" or a voluntary "tip" within the customer's discretion. *Compere*, 28 F.4th at 1189 (citing 29 C.F.R. §§ 531.52, 531.55). Because tips are not part an employees' "regular rate of pay," Defendants may not use them to offset their wage obligations under the FLSA. *Id.* at 1181. Put simply, if the service charge *is* a tip, the FLSA bars Defendants from using that money to satisfy its FLSA wage obligations. *Id.* at 1182. But if the service charge is *not* a tip, Defendants could use it to meet its wage obligations. *Id.*

Here, the undisputed evidence establishes that a mandatory service charge was imposed on all bills. Level 6's menu disclosed to customers that: "PRICES ARE NOT

---

[28] Under 29 U.S.C. § 216 (b), an unpaid overtime wage violation by an employer does not need to be willful for the employer to be liable for unpaid overtime compensation. However, the statute of limitations for bringing a FLSA claim is generally two years, but it is extended to three years if the violation is willful. 29 U.S.C § 255; *Morgan v. Fam. Dollar Stores, Inc.*, 551 F.3d 1233, 1280 (11th Cir. 2008). Here, Plaintiff worked at Amal during the summer of 2022, and his Complaint was filed on January 2, 2024. The Complaint was thus filed within the two-year statute of limitations and Plaintiff need not establish that Defendants acted willfully.

INCLUSIVE OF 20% SERVICE CHARGE." (D.E. 90-16 at 1).[29]   The undisputed facts show that the decision to pay the service charge, and the amount to pay, were not decided by the customer.[30]   The Court thus finds that Level 6's service charge was a commission i.e., a "compulsory charge for service" and not voluntary "tip."   As such, Defendants could use the service charge to meet their wage obligations under the FLSA.

### 2.   7(i) Exemption

For Defendants to prevail on summary judgment under the 7(i) exemption they must show that: (1) Level 6 is a retail or service establishment; (2) Plaintiff's "regular rate of pay" exceeds 1.5 times the applicable minimum wage, and (3) more than half of Plaintiff's compensation for the applicable representative period consists of commissions on goods or services.  *Compere v. Nusret Miami, LLC*, No. 19-CV-20277, 2020 WL 4464627, at *4 (S.D. Fla. May 31, 2020), *aff'd*, 28 F.4th 1180 (11th Cir. 2022) (citing 29 U.S.C. § 207(i)).

As to the first element, it is undisputed that Level 6 is a service establishment. Regarding the second element, the "regular rate of pay" is the hourly rate actually paid to Plaintiff "for the normal, non-overtime workweek for which he is employed and by its very nature must reflect all payments which the parties have agreed shall be received regularly during the workweek, exclusive of overtime payments."  *Compere*, 2020 WL 4464627, at

---

[29] Again, Defendants have filed the actual menu as record evidence, and not merely deposition testimony concerning its contents.  Therefore, the Court is not relying on inadmissible hearsay.

[30] In *Soliman v. SOBE Miami, LLC*, this Court found that waitstaff were not exempt under 7(i). 312 F. Supp. 3d 1344, 1352 (S.D. Fla. 2018).  However, *Soliman* involved a restaurant with a menu specifying that the service charge was merely discretionary and other facts that are not present here.  *See id.* at 1351.

*2 (citing 29 C.F.R. § 779.419(b)).  This is calculated by dividing the total compensation

received by the total number of hours worked.  *Id.* (citing 29 C.F.R. § 778.118).  In other

words, total earnings divided by total hours worked equals the regular hourly rate.  *Id.*  The

Parties have filed Plaintiff's paystubs (D.E. 87-5)[31] as record evidence, and the undisputed

evidence shows as follows:

<u>Amal Paystubs</u>

Pay Period: 6/12/22 to 6/25/22
Total Earnings: $2,158.32
Total Hours Worked: 84.80
Total Earnings divided by Total Hours Worked= $25.45 hourly rate

Pay Period: 6/26/22 to 7/9/22
Total Earnings: $2,656.87
Total Hours Worked: 65.58
Total Earnings divided by Total Hours Worked= $40.51 hourly rate

Pay Period: 7/10/22 to 7/23/22
Total Earnings: $2,096.63
Total Hours Worked: 49.78
Total Earnings divided by Total Hours Worked= $42.12 hourly rate

Pay Period: 7/24/22 to 8/6/22
Total Earnings: $3,363.31
Total Hours Worked: 82.80
Total Earnings divided by Total Hours Worked= $40.62 hourly rate

Pay Period: 8/7/22 to 8/20/22
Total Earnings: $2,850.19
Total Hours Worked: 63
Total Earnings divided by Total Hours Worked= $45.24 hourly rate

Pay Period: 8/7/22 to 8/20/22
Total Earnings: $2,850.19
Total Hours Worked: 63

---

[31] The copies provided by the Parties are identical (*compare* D.E. 87-5 *with* D.E. 90-3); however, the Court will rely on the copy provided by Plaintiff as the non-moving party.

Total Earnings divided by Total Hours Worked= $45.24 hourly rate

Pay Period: 8/21/22 to 9/3/22
Total Earnings: $5,353.20
Total Hours Worked: 93.55
Total Earnings divided by Total Hours Worked= $57.22 hourly rate

Pay Period: 8/21/22 to 9/3/22
Total Earnings: $5,353.20
Total Hours Worked: 93.55
Total Earnings divided by Total Hours Worked= $57.22 hourly rate

<u>Level 6 Paystubs</u>

Pay Period: 4/30/23 to 5/13/23
Total Earnings: $275.00
Total Hours Worked: 25
Total Earnings divided by Total Hours Worked= $11 hourly rate[32]

Pay Period: 5/14/23 to 5/27/23
Total Earnings: $7,226.72
Total Hours Worked: 97.68
Total Earnings divided by Total Hours Worked= $73.98 hourly rate

Pay Period: 5/28/23 to 6/10/23
Total Earnings: $7,040.03
Total Hours Worked: 101.97
Total Earnings divided by Total Hours Worked= $69.04 hourly rate

Pay Period: 6/11/23 to 6/24/23
Total Earnings: $3,411.95
Total Hours Worked: 56.64
Total Earnings divided by Total Hours Worked= $60.23 hourly rate

Pay Period: 6/25/23 to 7/8/23
Total Earnings: $3,115.36
Total Hours Worked: 53
Total Earnings divided by Total Hours Worked= $58.78 hourly rate

Pay Period: 7/9/23 to 7/22/23

---

[32] The Parties agree that Plaintiff worked training hours at Florida's then minimum wage of $11. (*See* D.E. 91 ¶ 21; D.E. 100 ¶ 21).

Total Earnings: $4,085.36
Total Hours Worked: 68.53
Total Earnings divided by Total Hours Worked= $59.61 hourly rate

Pay Period: 7/23/23 to 8/5/23
Total Earnings: $3,536.98
Total Hours Worked: 59.72
Total Earnings divided by Total Hours Worked= $59.22 hourly rate

Pay Period: 8/6/23 to 8/19/23
Total Earnings: $3,027.46
Total Hours Worked: 49.54
Total Earnings divided by Total Hours Worked= $61.11 hourly rate

Pay Period: 8/20/23 to 9/2/23
Total Earnings: $3,784.15
Total Hours Worked: 54.28
Total Earnings divided by Total Hours Worked= $69.71 hourly rate

(D.E. 87-5 at 1–16).

In sum, the undisputed facts above show that Plaintiff was paid more than 1.5 times the minimum wage at all relevant periods. The Parties agree that Florida's minimum wage was $10 in 2022, and $11 in 2023. So, while 1.5 times the $11 minimum wage is $16.50, Plaintiff's typical hourly rate ranged from approximately $40 to $70. Plaintiff was thus comfortably above the threshold. As such, the second element is satisfied.

Finally, as to the third element, the undisputed evidence establishes that more than half of Plaintiff' earnings came from commissions i.e., the mandatory service charges. It is further undisputed that these were commissions on goods and services in a restaurant. Therefore, the third element is satisfied.

In sum, all three elements are satisfied, and Defendants have met their burden of establishing the 7(i) exemption. *See Compere*, 2020 WL 4464627, at *4 (citing 29 U.S.C.

§ 207(i)). Therefore, Defendants' Motion is due to be granted, and they are entitled to summary judgment on Count II as to all overtime claims involving Level 6.

**Count III: Unpaid Service Charge Distributions**

This count relates to the service charge pools in effect during Plaintiff's First Employment Period at Amal and for the duration of his employment at Level 6. (D.E. 1 ¶¶ 31–36).

**a.      Plaintiff's Motion**

As explained, Amal and Level 6 kept a percentage of the service charge proceeds to cover restaurant expenses and split the remainder between restaurant employees in certain percentages. As to Amal, the restaurant kept 10% of the service charge proceeds and the remaining 90% was distributed between servers 25%, bartenders 25%, runners 15%, bussers 12.5%, and barbacks 12.5%. (D.E. 87-14). As to Level 6, the restaurant kept 3.5% of service charge proceeds to cover restaurant expenses and a point system methodology was used to split the remaining proceeds between servers, bartenders, runners, bussers, and barbacks. (D.E. 87-15).

Plaintiff avers that Defendants impermissibly split service charge proceeds with "ineligible workers … who are not lawfully employed." (D.E. 89 at 16). Plaintiff claims that based on Defendants' distribution summaries, Defendants disburse "less than the full 90% promised share of the revenues, because Defendants uniformly includes ineligible workers in those distributions." D.E. 89 at 17. In other words, Plaintiff appears to allege that Defendants skim from the service charge pool to pay undocumented workers under the table. Plaintiff, however, fails to provide sufficient factual or legal support for his claim.

Factually, Plaintiff points to the restaurants' employment verification documents (D.E.'s 87-16, 87-17) which contain the USCIS Form I-9's for employees eligible to work in the United States.  (D.E. 88 ¶ 51).  Plaintiff avers that the restaurants' service charge distribution reports (D.E.'s 87-7, 87-8) contain names and employee numbers that do not match with the list of employees who are verified to work in the United States.  (D.E. 88 ¶ 52).  Put differently, Plaintiff claims that service charge proceeds were distributed to individuals who do not have employment verification documents on file.  Plaintiff thus asserts that these individuals were working illegally.  Defendants contend this is because although they "had a policy to verify each employees' eligibility to work [they] were only able to find a portion of the eligibility documents."  (D.E. 98 ¶ 52).

Plaintiff cites to the documents above generally and fails to specify page numbers showing a discrepancy or the names or employee numbers of any individuals being paid service charge proceeds without corresponding eligibility documents on file.  As the moving party, Plaintiff bears the burden on summary judgment, and it is not the Court's responsibility to do the work for him.  *See Celotex*, 477 U.S. at 323.  But even assuming Plaintiff is correct—and there are names in the service charge distribution reports without corresponding immigration documents—Plaintiff fails to cite any legal authority for why he is entitled to summary judgment.[33]

---

[33] The Court, of course, agrees that hiring undocumented workers is against the law.  Defendants face civil and criminal penalties for non-compliance.  But the Court is unable to make any such determination on this record and expresses no opinion regarding Defendants' compliance with immigration law.

To the contrary, it is well-established in this Circuit that undocumented workers may recover unpaid wages under the FLSA. *See Lamonica v. Safe Hurricane Shutters, Inc.*, 711 F.3d 1299, 1307 (11th Cir. 2013) ("[T]here is nothing in the FLSA that would allow us to conclude that undocumented aliens, although protected by the Act, are nevertheless barred from recovering unpaid wages thereunder."); *Patel v. Quality Inn S.*, 846 F.2d 700, 706 (11th Cir. 1988) ("[U]ndocumented workers are 'employees' within the meaning of the FLSA and ... such workers can bring an action under the act for unpaid wages and liquidated damages."). So, employers must pay undocumented workers. What does not follow is Plaintiff's claim to wage theft based on Defendants' alleged payments to undocumented workers from the service charge pools. Plaintiff has cited no authority— and the Court is aware of none—entitling him to relief, much less summary judgment. Consequently, Plaintiff's Motion is due to be denied, and he is not entitled to summary judgment on Count III.

### b.    Defendants' Motion

Much of the analysis above applies with equal force to Defendants' Motion. Defendants cite to the binding caselaw discussed above holding that undocumented workers are entitled to the protections of the FLSA. (Def.'s Mot. at 12 (citing *Patel*, 846 F.2d at 706)). In his Reply, Plaintiff cites to the Eight Circuit's opinion in *Lucas v. Jerusalem Cafe, LLC*, 721 F.3d 927, 933 (8th Cir. 2013). (D.E. 105 at 7). Therein, the Eighth Circuit determined that "[l]ike the Eleventh Circuit, we hold that aliens, authorized

to work or not, may recover unpaid and underpaid wages under the FLSA."[34]  *Id.*  As such, *Lucas* only further undermines Plaintiff's claim.

Plaintiff also cites to *Hoffman Plastic Compounds, Inc. v. N.L.R.B.*, 535 U.S. 137, 146 (2002).  (D.E. 105 at 7).  In *Hoffman*, the Supreme Court held that under the Immigration Reform and Control Act of 1986 ("IRCA"), employers must verify potential employees' eligibility to work—and employers who violate the IRCA face civil fines and criminal prosecution.  *Id.*  The Court, of course, agrees with this statement of the law. However, *Hoffman* says nothing about Plaintiff's asserted right to recover wages from a service charge pool under the FLSA.  Moreover, Plaintiff's argument is foreclosed by *Lamonica*, 711 F. 3d at 1307 ("*Hoffman* does not give us cause to reconsider whether the IRCA was intended to amend the FLSA by implication, removing undocumented aliens from its protection."); *see also Lucas*, 721 F.3d at 935 ("[T]he IRCA does not express Congress's clear and manifest intent to exclude undocumented aliens from the protection of the FLSA." (quoting *Lamonica*, 711 F. 3d at 1308))).

As Count III rests entirely on Plaintiff's undocumented worker argument, the Court finds "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Therefore, Defendants' Motion is due to be granted, and they are entitled to summary judgment on Count III.

---

[34] *Lucas* also contains a robust explanation of the policy rationale for this holding.  In short, there are a host of laws aimed at preventing employers from hiring undocumented workers and punishing those who offend.  However, there is no reason to treat offenders more leniently by allowing them to withhold wages from their illegally hired undocumented employees. *See Lucas*, 721 F.3d at 933.

**Count IV: FLSA (Tip Confiscation)**

This count relates to the pooling of voluntary tips. (D.E. 1 ¶¶ 37–45). Because the analysis overlaps completely, the Court will jointly address Plaintiff and Defendants' Motions. Plaintiff challenges—and Defendants defend—the tip pools in place for the duration of his employment at Level 6 and during his First Employment Period at Amal. (*See* D.E. 89 at 12 (citing D.E. 88 ¶¶ 21, 23, 29, 31)). Plaintiff cites to the Tip Pool Notices in place at Level 6 (D.E. 87-13) and during his First Employment Period at Amal (D.E. 87-12).[35] (*Id.*). Based on these notices, Plaintiff argues that "Defendants openly keep and use at least 25% of Plaintiff's tips to pay workers who are not eligible to even work, let alone participate in a valid tip pool of persons who customarily receive tips." (*Id.*). In their Response, Defendants assert that the tip pools are valid, and Plaintiff's Motion is based on an erroneous interpretation of law. (*See* D.E. 99 at 4-5).

"An employer that pays its tipped employees the full minimum wage and does not take a tip credit may impose a tip pooling arrangement that includes dishwashers, cooks, or other employees in the establishment who are not employed in an occupation in which employees customarily and regularly receive tips." 29 C.F.R. § 531.54(d). This regulation clarifies that the prohibition against including employees who do not customarily and regularly receive tips in a tip pool applies only when the employer is taking a tip credit under 29 U.S.C. § 203(m)(2)(A). When no tip credit is claimed, the employer has more flexibility in structuring the tip pool. *See* 29 C.F.R. § 531.54(d). Put differently, an

---

[35] The Tip Pool Notices that Plaintiff filed as record evidence are identical. (*Compare* D.E. 87-13 *with* D.E. 87-12). The Court thus finds that the restaurants operated under the same tip pool policy.

employer who does not claim a tip credit can require tipped employees to share tips with other employees, including those who do not customarily and regularly receive tips, as long as the employer does not retain any portion of the tips for itself.  *See Aguila v. Corp. Caterers II, Inc.*, 199 F. Supp. 3d 1358, 1360 (S.D. Fla. 2016), *aff'd sub nom. Aguila v. Corp. Caterers IV, Inc.*, 683 F. App'x 746 (11th Cir. 2017).

Here, the Tip Pool Notices state that because the restaurants pay employees "above the minimum wage (hourly rate plus service charges/commissions)" they "will not be claiming a tip credit and may require that designated employees that have not customarily and regularly participated in tip pooling arrangements also participate in the tip pool." (D.E.'s 87-12, 87-13).[36]  With his hourly rate plus service charges/commissions, it is undisputed that Plaintiff earned above the minimum wage.  Additionally, the Tip Pool Notices show that neither restaurant claimed a tip credit during the relevant periods and neither retained any portion of the tips for restaurant expenses.  Consequently, the restaurants were permitted to include employees who do not customarily receive tips in the tip pool.

Additionally, the analysis from the prior section regarding undocumented workers and service charge pools applies with equal force to tip pools.  The Court thus adopts its earlier analysis and rejects Plaintiff's argument concerning the invalidity of the tip pool "due to lack of employment verification."  (D.E. 89 at 12).  Because there are no genuine issues of material fact, Plaintiff's Motion is due to be denied and Defendants' Motion is

---

[36] The Tip Pool Notices further specify that "managers and supervisors are not permitted to participate in the tip pool under any circumstances."  (*Id.*).

due to be granted.  Consequently, Defendants are entitled to summary judgment on Count IV.

### Count V: FLSA (Minimum Wage Violation)

This count alleges that Defendants paid Plaintiff less than minimum wage despite their non-compliance with the FLSA's tip credit requirements.  (D.E. 1 ¶¶ 46–55).

#### a.       Plaintiff's Motion

Plaintiff makes one argument specific to his Second Employment Period at Amal and a second argument concerning "all periods of employment."  (*See* D.E. 89 at 10–12).[37]

##### 1.       All Periods of Employment

Plaintiff contends that "[d]uring all periods of the Plaintiff's employment, he was required to subsidize Defendants' operations with his tips, because he was required to share his tips with persons who do not 'customarily and regularly' receive tips, including persons who are not even eligible to work."  (D.E. 89 at 12).  Once again, this argument is a repeat of the undocumented worker argument made in support of Counts III and IV.  The Court thus adopts its analysis above and finds that Plaintiff's Motion is due to be denied, and Defendants' Motion is due to be granted.  Therefore, Defendants are entitled to summary judgment as to Plaintiff's claim alleging tip sharing with undocumented workers during "all periods of employment."

---

[37] To be clear, the Court limits its inquiry to these two issues raised in Plaintiff's Motion as to Count V.  (*See id.*).

## 2.    Amal: Second Employment Period

To recap, this period spanned June 26, 2022–September 4, 2022 and is marked by Amal abandoning the 7(i) exemption, and instead classifying Plaintiff as a "tipped employee."  Plaintiff asserts that "[i]n [the] Summer of 2022, Defendants paid less than the minimum wage, while maintaining the same 'Tip Policy' stating that Defendants would NOT claim a tip credit, and while they continued to unlawfully use Plaintiff's tips to pay into an invalid tip pool."  (D.E. 89 at 11).  Defendants counter that they did not maintain the same "Tip Policy" during his Second Employment Period at Amal.  (D.E. 98 ¶ 59). Instead, they clarify that the Tip Pool Notice (D.E. 87-12) that Plaintiff references was terminated and superseded by the Tipped Employee Notice (D.E. 90-5)[38] which remained in effect for the duration of the Second Employment Period.  (D.E. 98 ¶ 59).  The Tipped Employee Notice specifies that Amal would be taking a "tip credit" toward its obligation to pay at least the minimum wage.  (D.E. 90-5).  Therefore, Plaintiff's contention that Amal was NOT claiming a tip credit is incorrect.

To summarize, during the First Employment Period Amal collected service charges, claimed the 7(i) exemption, and operated pursuant to the Tip Pool Notice (D.E. 87-12). Then, during the Second Employment Period, Amal stopped collecting service charges, categorized Plaintiff a "tipped employee," took a tip credit, and operated pursuant to the (D.E. 90-5) Tipped Employee Notice.

---

[38] This notice was filed as record evidence in support of Defendants' Motion and Plaintiff does not dispute its authenticity.

Plaintiff fails to provide a genuine rebuttal to Defendants' clarification.  In his Reply, Plaintiff entirely fails to address—much less rebut—the import of the Tipped Employee Notice (D.E. 90-5).  (*See* D.E. 105 at 5–6).  Instead, he refers to the second page of the Tipped Employee Notice (D.E. 90-5 at 2) while ignoring the substance of the notice on page one.  (*See id.*).[39]  However, notably, Plaintiff makes no objection to the notice's authenticity, and he does not dispute his signature on page two.  (*See id.*).  Plaintiff proceeds to cite Level 6's Tip Pool Notice (D.E.'s 87-12, 90-8), even though he did not work at that establishment until the following year.  In sum, Plaintiff's Reply is largely nonsensical, and the Court finds that Plaintiff entirely fails to rebut Defendants' clarification of the two employment periods at Amal.  *See Celotex*, 477 U.S. at 323.  Because Plaintiff's argument is based on plainly erroneous facts, and he fails to provide evidence otherwise, he fails to meet his burden for a grant of summary judgment.  Consequently, Plaintiff's Motion is due to be denied as to his Second Employment Period at Amal, and he is not entitled to summary judgment.

### b.    Defendants' Motion

Defendants assert that Amal's Tip Pool was "legal and authorized."  (D.E. 92 at 13).  In his Response, Plaintiff repeats his above-debunked assertion that "[d]uring Summer of 2022, Defendants paid less than [minimum wage], while maintaining the same 'Tip Policy'

---

[39] Specifically, the first paragraph on page one of the Tipped Employee Notice states that: "This is to advise you that you are considered a 'tipped' employee and that INK 477, LLC is taking a 'tip credit' towards meeting its obligation to pay you at least the minimum wage.  This is to further advise you that you will be required to participate in a 'tip pool.'"  (D.E. 90-5 at 1).

stating that Defendants would NOT claim a tip credit, and while they continued to unlawfully use Plaintiff's tips to pay into an invalid tip pool." (D.E. 101 at 21).

The FLSA permits an employer to pay less than minimum wage to "tipped employees."[40]   29 U.S.C. § 203(m).   That is, if an employee qualifies as a "tipped employee," the employer may take what is commonly referred to as the "tip credit." *See Ash v. Sambodromo, LLC*, 676 F.Supp.2d 1360, 1366 n.9 (S.D. Fla. 2009) ("The difference between the amount an employee must be paid under the minimum wage law and the amount directly paid to a tipped employee is commonly referred to as a 'tip credit.'")   To claim the tip credit, the employer must satisfy two conditions: (1) the employer must inform the employee of the provisions of the tip credit subsection of the FLSA; and (2) the employee must be allowed to retain all tips she receives, except where tips are pooled among employees who "customarily and regularly receive tips."  29 U.S.C. § 203(m).

As to the first condition, the Court adopts its analysis from the prior section and finds that Plaintiff does not meaningfully dispute that he received and signed Amal's Tipped Employee Notice (D.E. 90-5).  The Court further finds that the Notice sufficiently informed Plaintiff "of the tip credit subsection of the FLSA." 29 U.S.C. § 203(m).  Under the FLSA, employers do not have to "explain" the tip credit to employees; it is enough to "inform" them of it through a poster or notice like the one here. *See Pellon v. Bus. Representation Int'l, Inc.*, 528 F. Supp. 2d 1306, 1310 (S.D. Fla. 2007), *aff'd*, 291 F. App'x

---

[40] Again, "tipped employee" means "any employee engaged in an occupation in which he customarily and regularly receives more than $30 a month in tips." 29 U.S.C. § 203(t). This is a low bar, and it is undisputed that Plaintiff qualified.

310 (11th Cir. 2008).   Moreover, Plaintiff's uncertainty in his deposition regarding notification of the change is insufficient to refute the Tipped Employee Notice (D.E. 90-5). *See Pellon*, 528 F. Supp. 2d at 1311 (Deposition testimony of witness that he "does not recall" information contained in poster was insufficient on summary judgment to refute record evidence unequivocally establishing information contained in poster.).

Regarding the second condition, the Court adopts its prior analysis and rejects Plaintiff's allegation concerning undocumented workers in the tip pool.  Additionally, there is no evidence of managers, chefs, or other parties who do not "customarily and regularly receive tips" participating in the tip pool during this period.  *See* 29 U.S.C. § 203(m) (prohibiting managers or supervisors from keeping any portion of employees' tips); *Ash*, 676 F.Supp.2d at 1370 (finding a genuine issue of fact as to whether sushi chefs could participate in a tip pool); *Soliman*, 312 F. Supp. 3d at 1354 (finding a genuine issue of fact as to whether restaurant managers could participate in a tip pool).  To the contrary, Amal's Tip Pool Notice (D.E. 87-12) only includes bussers, runners, and hostesses as part of the server tip pool, and expressly states that "managers and supervisors are not permitted to participate in the tip pool under any circumstances."  (*Id.*).

In sum, both conditions are satisfied, and the Court finds there is no genuine issue of fact as to whether Defendants may claim the "tip credit" during the Second Employment at Amal.  Therefore, Defendants' Motion is due to be granted, and they are entitled to summary judgment on Count V.

## IV.     Conclusion

Accordingly, it is **ORDERED AND ADJUDGED** that:

**1.**     Plaintiff's Motion for Summary Judgment (D.E. 89) is **DENIED** as to Counts I, III, IV, and V.   As to Count II, Plaintiff's Motion is **GRANTED IN PART AND DENIED IN PART.**   Plaintiff's Motion is **GRANTED** to the extent the Court rules in favor of Plaintiff and against Defendants as to unpaid overtime wages during the Second Employment Period at Amal in the amount of $51.98, plus liquidated damages in the amount of $51.98, for a total amount of $103.96.[41]   Plaintiff's Motion is **DENIED** in all other respects.

**2.**     Defendants' Motion for Summary Judgment (D.E. 92) is **GRANTED** as to Counts I, II, III, IV, and V consistent with this Order.

**3.**     Final judgment shall issue by separate Order.

**DONE AND ORDERED** in Chambers at Miami, Florida this 8th day of April, 2025.

*Joan A. Lenard*

**JOAN A. LENARD**
**UNITED STATES DISTRICT JUDGE**

---

[41] Again, the Court finds that Plaintiff is entitled to a judgment of $103.96 rather than the $3,882.24 judgment he requested.